(No. 19098.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MARSHALL COWGILL, Plaintiff in Error.

*Opinion filed April 20, 1929—Rehearing denied June 6, 1929.*

GEORGE W. SPRENGER, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, LOUIS P. DUNKELBERG, and ROY D. JOHNSON, (HAROLD J. RUST, of counsel,) for the People.

Mr. CHIEF JUSTICE DEYOUNG delivered the opinion of the court:

An indictment consisting of eighteen counts, charging embezzlement and obtaining money by means of the confidence game, was returned in the circuit court of Tazewell

county against Marshall Cowgill. A *nolle prosequi* was entered upon all the counts except the ninth, which charged that Cowgill, a clerk in the employ of the receivers of the Chicago and Alton Railroad Company, had embezzled $4000, the property of the receivers. A jury trial resulted in a verdict finding the defendant guilty and fixing the sum embezzled at $3415.15. Motions for a new trial and in arrest of judgment were made and denied and Cowgill was sentenced to the penitentiary. He prosecutes this writ of error.

Marshall Cowgill, the plaintiff in error, thirty-five years of age, a resident of the city of Pekin, in Tazewell county, was employed by the receivers of the Chicago and Alton Railroad Company at the station in that city from November, 1921, until July 3, 1927. His duties were to sell tickets, collect freight charges and keep the books and records of the station. He was responsible for the money received, and he was obliged to remit his receipts each day to the treasurer of the receivers at Chicago. All entries in the books during the period of his employment, except for three weeks in May, 1926, when he was ill, were in his handwriting. Ernest F. Reeder, the station agent, was the head of the office at Pekin. He had employed Cowgill and had authority to dismiss him. During Cowgill's illness, in May, 1926, Reeder kept the books and performed most of Cowgill's duties. While Reeder had access to the drawer in which the money was kept, he accounted to Cowgill for the cash receipts of the station. The only other person having duties of a clerical nature in and about the station was one Fisher, who acted principally as a freight checker. He had no access to the cash drawer nor was he concerned with the custody or keeping of the records of the station.

The receivers of the Chicago and Alton Railroad Company had in their employ a traveling auditor, who made periodic audits of the accounts of their various railroad stations. Mark Millard audited the books at the Pekin station

in March, 1926, and June, 1927, and from July 3 to July 25, 1927. The last audit disclosed many items on the books kept by Cowgill as uncollected which in fact had been collected. About once a week the Peoria Railway Terminal Company sent Cowgill a sheet containing a list of all freight items which it owed the receivers. The sheet was accompanied by a draft in settlement. It was Cowgill's duty to enter these items in his cash book and to forward the draft to the depositary of the receivers in Chicago. Cowgill forwarded the drafts received from the terminal company but would omit to enter in his cash book one or more of the items shown by the settlement sheet. The cash book, in consequence, showed the collections from the terminal company to be less than that company's remittances. Cowgill then took from the cash drawer money derived from ticket sales and freight charges to equal the sum of the items which he omitted from his cash book. In this manner that book was kept in balance, but the uncredited items on the settlement sheets sent by the terminal company increased in number as the manipulation of the accounts continued. The records of the terminal company, its settlement sheets and drafts disclosed no indebtedness to the receivers of the Chicago and Alton Railroad Company. The cash book kept by Cowgill eventually showed that the terminal company was indebted to the receivers in a considerable amount.

Mark Millard, the traveling auditor, testified that he had a conversation with Cowgill at the station in Pekin late in the afternoon of July 3, 1927, in which he told him that he desired an explanation concerning certain items in the accounts of the Peoria Railway Terminal Company which were carried as unpaid. He asked Cowgill whether he was short in his accounts. The conversation was interrupted by acquaintances of Cowgill who came to the station. Cowgill sought to excuse himself to take his visitors to his home, but Millard said that he would accompany him, and did so. Later, on their return to the station, Cow-

gill admitted that he had manipulated the transactions with the terminal company; that he had expected to refund the shortage before it was discovered but that he could not do so, and that he knew a term of imprisonment confronted him. Millard further inquired whether any other person was implicated with him. Cowgill answered in the negative, and added that the shortage arose solely out of the settlements with the terminal company. Millard then informed Reeder, the station agent, of Cowgill's admissions, and Cowgill gave Reeder certain keys to the station and $70 in money which belonged to the receivers. About a week later Millard met Cowgill and his attorney at the latter's office. The attorney inquired how the auditor knew that Cowgill was responsible for the shortage, and Millard informed him that the fact was disclosed by the books kept in his client's handwriting. The amount of the shortage was then asked, and the attorney was told that it would not be known until the audit was completed. He replied that when the exact figure was available the receivers would be reimbursed, provided Cowgill was afforded the opportunity to verify the correctness of their demand. Millard assented to this arrangement. Reeder corroborated Millard's testimony concerning that part of the conversation held on July 3, 1927, in which Cowgill admitted his guilt.

The books and records of the station at Pekin and the settlement sheets and drafts of the terminal company sent to Cowgill were admitted in evidence. By stipulation, however, an audit of the books and records prepared by the receivers' auditor was substituted in the record. Cowgill's defalcation was shown to be $3415.15.

Cowgill, the plaintiff in error, did not testify. Only one witness was called by the defense, and he testified that he was in the office of Cowgill's attorney at the time the latter, his client and Millard held their conference; that Millard, in answer to a question whether Cowgill had admitted taking money, merely said that Cowgill's books

showed a shortage. This witness further testified that he heard nothing with reference to the reimbursement of any money wrongfully appropriated by Cowgill.

The plaintiff in error contends that the testimony of Millard, the auditor, who was permitted to state the result of his examination of the books and records of the receivers at the Pekin station and of the records and documents of the terminal company, was incompetent and therefore inadmissible in evidence. These books, records and documents were competent evidence and disclosed discrepancies amounting to $3415.15 in the cash account of the plaintiff in error. The auditor's testimony concerning the result of his examination was based upon and confined to these books, records and documents. For many years it had been his duty to examine and audit the books and records at railroad stations and he was an expert in work of that character. Where original evidence consists of numerous books, records, papers and documents which can not conveniently be examined in open court and the fact to be proved is the general result of an examination of the whole collection, evidence of such result may be given by any competent person who has examined the originals, provided the result is capable of being ascertained by calculation. (*People* v. *Preble,* 316 Ill. 233; *People* v. *Wulff,* 313 id. 286; *People* v. *Gerold,* 265 id. 448.) The auditor's testimony complied with the requirements of the foregoing rule.

Another contention made by the plaintiff in error is that the auditor's testimony was either hearsay or based upon hearsay testimony. An employee of the terminal company testified that he drew drafts, or caused them to be drawn, in behalf of that company to the order of the receivers, and the drafts themselves were admitted in evidence. The drafts were confined to those which corresponded to the items shown by the settlement sheets which, with the drafts, had been received by the plaintiff in error. Both were used

to check the items shown on the books kept by the plaintiff in error. All the documentary evidence was directly connected with his accounts and related to the charge in the indictment. The testimony of the employee of the terminal company was subject to the test of cross-examination, and the documentary evidence was open to the scrutiny of counsel for the plaintiff in error. Both constituted direct evidence tending to establish links in the chain of facts or circumstances showing knowledge on the part of the plaintiff in error of the shortage and his guilt of the embezzlement. The auditor's testimony was neither hearsay nor based on hearsay testimony and was properly admitted.

The plaintiff in error further contends that one of the questions asked the auditor by counsel for the prosecution called for an answer determinative of the ultimate fact in issue and for that reason invaded the province of the jury. On cross-examination the auditor was asked by counsel for the plaintiff in error whether the latter had not on September 30, 1924, remitted all the terminal company drafts to the receivers, and the auditor answered in the affirmative. Counsel further inquired whether all the items shown by the bill of particulars from June 9, 1925, to June 21, 1927, represented the differences between the terminal company's payments and the sums with which the plaintiff in error charged himself on the same dates, respectively. The witness answered that they did, and that it was not charged that the plaintiff in error took anything out of the terminal company's drafts. The next question was whether the witness knew of his own knowledge that on the respective dates shown the plaintiff in error had actual custody of the drafts sent by the terminal company. The witness stated, "I don't know of my own knowledge except—," but before he could proceed counsel for the plaintiff in error interrupted him, stating, "That's enough; we don't want any argument." To avoid a prejudicial inference from the foregoing answer the auditor was asked on re-direct examination how, if the

plaintiff in error had sent all the terminal company's drafts to the receivers, he failed to account for the items charged against him. An objection was made that the question invaded the province of the jury. The court ruled that the witness might answer what he found. A question to that effect followed, an objection made to the question was overruled, and the witness answered that the items withheld from the terminal company's settlements were taken from collections made from other sources in order to offset the items omitted from those settlements. Counsel for the plaintiff in error moved that the answer be stricken, but the motion was denied. The auditor properly stated what he found but the rest of the answer should have been stricken. On further examination by counsel for the plaintiff in error the auditor gave a complete explanation of the method by which it was determined that the plaintiff in error was short in his cash accounts. The evidence, taken as a whole, clearly showed the fraudulent purpose in the manipulation of his accounts, and the error in allowing the objectionable part of the auditor's answer to stand was harmless. *People v. Slattery,* 312 Ill. 202.

It is contended that mere proof of the receipt of funds by the plaintiff in error and his failure to account for them does not in itself show embezzlement but that there must be further evidence of the conversion. The plaintiff in error personally kept the books at the station in Pekin. He omitted to transfer items from the settlement sheets sent by the terminal company and through such omissions appropriated money derived from the sale of tickets and the collection of freight charges. These omissions and appropriations he kept concealed until they were discovered by an audit of his books and records. When the discovery was made he admitted his shortage and said that he had expected to make restitution. He did not manipulate his accounts to shield another's peculations, for he expressly disclaimed that any other person was implicated with him.

A guilty intent is necessarily inferred from his voluntary acts, the inevitable effect of which was to deprive the receivers of their property and the appropriation of it to his own use. Intention to restore the money wrongfully taken cannot eradicate the criminal nature of the transaction. (*People* v. *Schrager*, 315 Ill. 169; *Spalding* v. *People*, 172 id. 40; 2 Bishop on Crim. Law,—9th ed.—sec. 352.) His statement that he knew a term of imprisonment awaited him is an acknowledgment of his guilt. The evidence clearly showed a fraudulent conversion and it is sufficient to sustain a conviction for embezzlement. (1 McClain on Crim. Law, sec. 639; 2 Bishop on Crim. Law,—9th ed.—sec. 379.)

The judgment of the circuit court is affirmed.

*Judgment affirmed.*